# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KENNETH JOHNSON,            )
                             )
           Plaintiff,      )
                             )
           v.             )        1:21cv13
                             )
OFFICER. J. SMITH, et al.,   )
                             )
           Defendants.     )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendant Officer J. Smith's Motion for Summary Judgment as to All Claims" (Docket Entry 20) (the "Motion").[1] For the reasons that follow, the Court should grant the Motion.

## BACKGROUND

Pursuant to 42 U.S.C. § 1983, Plaintiff, an inmate with the North Carolina Department of Public Safety (the "NCDPS"), commenced this action against Officer J. Smith (at times, "Officer Smith" or "Defendant Smith") and "Unknown Detention Tactical Team Officers" (collectively, the "Defendants") (Docket Entry 2 (the "Complaint") at 2)[2] for alleged violations of his constitutional rights during

_____

    1  For legibility reasons, this Opinion uses standardized spelling and capitalization and omits the word "the" in front of "Plaintiff" and "Defendants" in all quotations from the parties' materials.

    2  Docket Entry page citations utilize the CM/ECF footer's
(continued...)

his 2018 incarceration at the Guilford County Central Jail (see id. at 1-13). The Court thereafter directed the Clerk to issue a summons to Officer Smith, explaining that "only Defendant Officer J. Smith currently stands as a proper defendant" in the matter. (Text Order dated May 12, 2021.) After Officer Smith answered the Complaint (see Docket Entry 14), the Court adopted a Scheduling Order, which established September 28, 2021, as the deadline for the "parties [to] file any motions seeking leave to amend pleadings or to add parties" (Text Order dated July 27, 2021). Neither party moved to amend the pleadings or add additional parties. (See Docket Entries dated July 27, 2021, to present (lacking any such motions).)[3]

Following close of discovery (see Text Order dated July 27, 2021 (establishing discovery deadline of March 28, 2022)), Officer Smith moved for summary judgment. (See Docket Entry 20.) In support of the Motion, Officer Smith filed various affidavits and

_____

2(...continued)
pagination.

    3  Accordingly, Officer Smith remains the only defendant in this action.  See also, e.g., Chidi Njoku v. Unknown Special Unit Staff, No. 99-7644, 217 F.3d 840 (table), 2000 WL 903896, at *1 (4th Cir. 2000) (explaining that "[t]he designation of a John Doe defendant is . . . appropriate only when the identity of the alleged defendant is not known at the time the complaint is filed and the plaintiff is likely to be able to identify the defendant after further discovery" and that "there is no basis to permit a judgment against an unidentified John Doe defendant").

video evidence. (See Docket Entries 22-24.) The following day, the Clerk sent Plaintiff a Roseboro Notice, warning that:

> The defendant filed a Motion for Summary Judgment on 05/18/2022 which may or may not be supported by affidavits.
>
> You have the right to file a 20-page response in opposition to the defendant's motion. If defendant filed a motion for summary judgment or filed affidavits, your response may be accompanied by affidavits setting out your version of any relevant disputed material facts or you may submit other responsive material. Your failure to respond or, if appropriate, to file affidavits or evidence in rebuttal within the allowed time may cause the court to conclude that the defendant's contentions are undisputed and/or that you no longer wish to pursue the matter. Therefore, unless you file a response in opposition to the defendant's motion, it is likely your case will be dismissed or summary judgment granted in favor of the defendant. A response to a motion for summary judgment must be filed within 30 days from the date of service on you.
>
> Any response you file should be accompanied by a brief containing a concise statement of reasons for your opposition and a citation of authorities upon which you rely. You are reminded that affidavits must be made on personal knowledge, contain facts admissible in evidence and be made by one shown to be competent to testify. . . .

(Docket Entry 25 at 1.) Despite this notice, Plaintiff did not respond to the Motion. (See Docket Entries dated May 18, 2022, to present (lacking any filings from Plaintiff).)

As such, the record before the Court reflects the following:

According to Plaintiff's unverified Complaint:

> On[] or about August 1, 2018[,] an altercation occurred between an unknown pre-trial detainee and officers in the Guilford County Central Jail (GCCJ). Per GCCJ customs, ordinances, regulations and[/]or policies, the Detention Tactical Team (D-TAC) was deployed.

3

Defendant Smith was among the other Unknown Defendants of the D-TAC officers who responded to this incident.

When the D-TAC Officers (Defendants) entered Plaintiff's wing, Plaintiff — who was completely uninvolved — was following the GCCJ policy requiring all detainees not involved in such incident[s] to go to their cells and lock in. However D-TAC without provocation came at Plaintiff slamming him onto the concrete floor and began to beat Plaintiff about his head and upper-body while the altercation for which they were deployed was still going on in another cell.

Although Plaintiff had been completely compliant, acting in a non-threatening or aggressive manner before, during, and immediately after being unduly assaulted by D-TAC officers, said officers still continued to use unreasonable excessive force upon Plaintiff by placing him in handcuffs and then slamming his head against a cell door which caused lacerations to [his] eye brow, visible bruising and swelling to his face and possible breaking of his cheek which now is uneven with the other, and chipping of his teeth.

D-TAC Officers were aware of Plaintiff's lacerations, bruising and facial swelling as well as the damage to his [teeth] where two were chipped during the incident and would have known Plaintiff was in need of immediate medical attention, however not [sic] only failed to provide said prompt medical attention but also refused to allow Plaintiff's self-initiated medical emergency requests. This left Plaintiff in pain and suffering causing his wounds to heal on their own resulting in the unevenness of his cheeks, permanently chipped teeth, and scarring to his face.

After they beat me they put me in a holding cell in booking and took all my clothes and left me in there for a couple days I was holding my head it was a lot of pain and the nurse and sic [sic] tried to talk to me I was so in pain that I could not speak they should have taken me to the hospital right there when I was unresponsive they finally took me to the hospital 2 days later and they told them I was mental health and I tried to tell the nurse that the C.O.'s beat me and they ask[ed] where did I hurt at and I told her my rib and my head and cheek bone is on fire she took a look at me and gave me some ice for my eye it was purple and black the Jail also has

4

pictures of my disfigurement in my cheek bones and my head was bloody from them slamming me into the wall while I was in handcuffs D-TAC Smith grabbed the C.O. that slammed my head into the door made me bleed in the middle of my forehead its all on camera in the pod and on body cam that needs to be looked at. Ms Manning/C.O. and Ms. King/C.O. put me in the hole after I've tried to put in a grievance but got denied my rights to get one then when I get grievance Sgt. Pearman would write me back saying there is nothing we can do you should have locked down faster. Then Ms. Manning with Ms. King told me if they find me guilty they will give me 90 days in the hole then they came back and said "look we got to give you 30 days in the hole any time you get into trouble with C.O.s and even if C.O.s mace you and you did not touch them you have to go to the hole." I said this is wrong they put me under stress. Sgt. Boggs denied me from grievance.

(Docket Entry 2 at 12-13.) Finally, the Complaint alleges that, "under the regulations, custom, ordinances, or usage of the North Carolina Guilford County Sheriff's Department[,] the Defendants were given full discretion and authority to use any amount of force against persons detained in the Guilford County Jail and did so — excessively and without justification — during the incident described herein." (Id. at 4.)

In turn, Officer Smith's evidence reflects:

On the date of the incident, Officer Smith served as a Guilford County Sheriff's Office (the "GCSO") Detention Officer, working on the Detention Tactical (the "D-TAC") Team. (See Docket Entry 22, ¶¶ 1-2.)[4] "Members of the D-Tac Team receive specialized

_____

4 "The incident involving Plaintiff and Officer J. Smith took place at the GCSO's Greensboro Detention Center on May 31, 2018, not August 1, 2018 as Plaintiff alleges in his Complaint." (Docket Entry 23, ¶ 5 (emphasis omitted).) The GCSO's Use of Force Reports
(continued...)

5

training on how to respond to incidents involving disruptive or combative inmates." (Id., ¶ 1.) On May 31, 2018, Officer Smith "was on duty at the Guilford County Detention Center in Greensboro ([the] 'Jail Central'). [Officer Smith] was not equipped with a body-worn camera; however, a wall-mounted facility camera located inside Plaintiff's housing unit (5E) captured the entire incident." (Id., ¶ 2.)

"At approximately 6:28 p.m. on [May 31, 2018, Officer Smith] responded to a 'Signal Zero' call (which means 'Officer-in-Danger') for assistance in Housing Unit 5E. Specifically, Master Corporal D. Taylor needed assistance with removing another inmate (not Plaintiff) from the unit." (Id., ¶ 4 (emphasis omitted).) Officer Smith avers:

> As the [housing surveillance] video recording begins, Plaintiff, Kenneth Bailey Johnson, is standing by the center pole, talking on the phone. Upon information and belief, and prior to my arrival, Plaintiff had been instructed by Officer Sherrod to hang up the phone and return to his cell. Plaintiff had refused to comply. You can see that at 6:28:30 p.m. Officer Sherrod approached Plaintiff and attempted to escort Plaintiff to his cell using "soft hands" (i.e., without grabbing or striking him). Plaintiff hung up the phone at 6:28:32 p.m. while Officer Sherrod kept his left hand on Plaintiff's back, calmly (but not forcefully) directing him toward his cell. Plaintiff pulled away

---

4(...continued)
reflect two incidents involving Plaintiff in 2018, namely an incident "on January 3, 2018[,] when he was placed in a restraint chair to prevent self-inflicted harm on himself" (id. at 3 n.1 (emphasis omitted)) and an incident on May 31, 2018, which "resembles" the incident "described in Plaintiff's Complaint" (id., ¶ 5).

from Officer Sherrod at 6:28:33 p.m. Plaintiff kept his arms and hands bunched up against his chest, appeared to stop walking, and attempted to turn toward Officer Sherrod in a physically intimidating manner. Several Detention Officers then entered the area beginning at 6:28:37 p.m.

The original Signal Zero request did not involve Plaintiff. However, most of the Officers responding to the Signal Zero addressed the developing situation between Plaintiff and Officer Sherrod in the middle of the dayroom, while approximately six Detention Officers, including myself, responded to the cell nearby (on the left side of the video) where the Signal Zero was called.

I enter the camera's view in the bottom left corner at 6:28:38 p.m. I am the bald, African-American man wearing black pants, a black short sleeve top and black protective gloves. I ran toward the center of the room near Plaintiff, but walked past him at 6:28:43 p.m. I proceeded to the left side of the room to the cell where the Signal Zero was called in order to offer further assistance. I approached that cell at 6:28:45 p.m. while Plaintiff was simultaneously taken to the ground by other Detention Officers, not including myself. **I played no role in bringing Plaintiff to the ground.** During the takedown, Officer Sherrod used a pushing method to assist the other Officers in taking Plaintiff to the ground. The use of force exercised to bring Plaintiff to the ground was necessary and appropriate given his refusal to comply with orders and his defensive demeanor and physical posture toward Officer Sherrod. At this time, I noticed the inmate in the cell where the Signal Zero was called was being restrained without further danger to the Detention Officers involved in that matter. I then proceeded across the dayroom to the right side of the room to the Officer's bathroom at 6:28:58 p.m. Here I obtained a set of full restraints (consisting of a waist chain and leg shackles) to assist in restraining Plaintiff who was laying on the floor, but still non-compliant and resisting the other Officers.

At 6:29:02 p.m., I exited the Officer's bathroom with restraints in my left hand and approached Plaintiff who [wa]s being restrained on the floor by other Detention Officers. From 6:29:10 p.m. to 6:29:35 p.m. I untangled and prepared the restraints to place on Plaintiff. During this period of time Plaintiff laid on

7

top of his arms, pinning his hands and arms to the floor with his body weight, and refused to put his hands behind his back so that he could be handcuffed. In order to safely get Plaintiff's arms behind his back, Officer O'Leary delivered two closed fist strikes to Plaintiff's left shoulder blade area and Sergeant Nelson subsequently delivered four elbow strikes to Plaintiff's right shoulder blade. These are techniques that Officers are trained to deliver to effectively detain a resisting and unruly inmate. These strikes, which are directed at the suprascapular nerves or "pressure points" in the shoulder blade area, are designed to cause an instantaneous but very temporary weakness in the arm (but no injury), thus enabling Officers to obtain control of the hand. In Plaintiff's case, the suprascapular strikes by Officer O'Leary and Sgt. Nelson were successful and caused Plaintiff to release his arms and be handcuffed without resulting in physical injury to Plaintiff or the Detention Officers. At 6:29:36 p.m., I can be seen on the video waving my right arm in the air indicating that any extra Detention Officers on scene could depart since the situation was under control.

At 6:29:58 p.m., I kneeled and began placing leg shackles around both of Plaintiff's ankles while another Officer held his legs crossed. As shown on the video, **I do so in a non-violent, professional, and respectful manner.** At 6:30:38 p.m., I stood up while other Detention Officers brought Plaintiff to his feet and then up against the wall so that a waist chain could be secured around Plaintiff's body. Plaintiff continued to not follow orders and refused to put his feet on the ground and this position (i.e., up against the wall) allowed Officers to have better control so that I could secure the waist chain. At 6:30:40 p.m., Plaintiff attempted to drop to his knees. Plaintiff was assisted back to his feet by the other Officers while they maintained control of his head and neck area.

The force used by the other Detention Officers in taking Plaintiff to the ground, delivering the suprascapular strikes, and placing Plaintiff against the wall was reasonable and necessary to restrain the uncooperative Plaintiff. Further, the force was proportionate to Plaintiff's level of physical resistance. In my assessment, the force used by the other Officers was limited to the amount necessary to keep Plaintiff under control and keep him from harming

8

the other Officers or inadvertently injuring himself. Because I deemed the force used by my fellow Officers to be legal, necessary and reasonable, there was no need for me to intervene in their actions.

At 6:31:49 p.m., I completed securing the waist chain. At 6:31:56 p.m., Plaintiff refused to walk out of the housing unit. I then took hold of Plaintiff's feet and lifted him by both of his legs to carry him to Main Floor Holding Cell 6. Other Officers carried Plaintiff's upper half by securing his arms and torso. As we did so, we were careful to make sure Plaintiff's head and body did not come into contact with walls or doors. Carrying him to the Main Floor in this manner was the fastest and most efficient method of getting him secured in a holding cell. With the incident over, the significant and relevant portion of the video (which includes all portions in which Plaintiff and his altercation appear) recorded by the wall-mounted camera in Housing Unit 5E ends at 6:32:20 p.m.; however, the video continues to play for approximately 11 minutes post-incident until 6:43:02 p.m.

Attached as Exhibit No. 2 to my Affidavit is a CD containing a complete, accurate, and unedited copy of the video captured by Sergeant S. Nelson's body-worn camera ("BWC"). It depicts Plaintiff being carried from Housing Unit 5E to the Holding Cell without incident or injury. I have personally reviewed this video and audio and it accurately reflects what occurred.

Once in Holding Cell 6 on the Main Floor, and as shown in Sgt. Nelson's BWC video, Plaintiff was examined by Jail Nurse Holley who is employed by Wellpath (the subcontractor hired by Guilford County to provide medical treatment to Jail inmates). This portion of the video refutes Plaintiff's allegation that the D-Tac Officers failed to provide prompt medical attention and that he was denied medical treatment. Attached as Exhibit No. 3 to my Affidavit is an accurate and complete copy of the Nurse's written assessment. It was recorded on a Detention Bureau Form #T2A, also known in Detention parlance as a "Gold Sheet". It reflects that at 6:49 p.m. Nurse Holley signed her written assessment that stated Plaintiff's restraints were checked to ensure adequate circulation to all his extremities and that **no injuries to Plaintiff were reported or noted**. Further, the video is significant in that it shows no outward

signs of any injury to Plaintiff and contradicts what he alleges in his Complaint.

Attached as Exhibit No. 4 to my Affidavit is an accurate and complete copy of the Use of Force Report that I prepared to document this incident. The use of force by all Officers involved was reviewed by the Detention chain of command and <u>determined to be justified</u>.

At all times as described in my Affidavit above, I never used "unreasonable excessive force," and at no point did I slam Plaintiff on the concrete floor, "beat Plaintiff about his head and upper-body," or slam his head against a cell door as he alleges in his Complaint. In fact, at no time did I ever strike, punch, kick, or tackle Plaintiff nor did I use any type of weapon against him. Throughout the entire engagement, my actions were appropriate and complied with the Sheriff's Use of Force Policy which, in May 2018, read as follows:

**13.1.3 Use of Force Permitted**

**The use of force is permitted as listed in the following sections, and only to the extent the force reasonably appears necessary to affect lawful objectives. Nothing in this directive authorizes the use of unnecessary force. The prohibition against the use of unnecessary force does not require an officer to meet an assaulting or resisting subject with strictly equal force. Rather, the officer is allowed to use that degree of force which is reasonably necessary to bring the subject under the officer's control.**

The existence of the cited policy negates Plaintiff's assertion that "under the regulations, customs, ordinances, or usage of the North Carolina Guilford County Sheriff's Department, Defendants were given full discretion and authority to use any amount of force against persons detained at the Guilford County Jail and do so excessively and without justification during the incident described herein." Again, my actions were appropriate and in compliance with the Sheriff's Use of Force Policy, which does not provide me "authority to use any amount of force against persons," but rather the

10

degree of force reasonably necessary to bring a subject under control.

> Ultimately, a Jail requires good order and discipline to function. Officer safety relies on it. There was a severe security problem in this situation, particularly given that an Officer-in-Danger call was placed, and Plaintiff was still located out on the floor, not in his cell as directed, when back-up arrived. If Plaintiff was permitted to refuse to return to his cell and allowed to angrily tell Officers not to "put their hands on him" while doing so, it would encourage the other inmates to do the same, creating not just a discipline issue but a safety problem for the greatly outnumbered Detention Officers.

(Id., ¶¶ 5-16 (emphasis in original) (internal paragraph numbering, citation, and certain emphasis omitted).)

Officer M. Diehl, the GCSO Court Liaison Officer, also provided an affidavit in support of the Motion. (See Docket Entry 23, ¶ 1.) As part of his official duties, Officer Diehl "maintain[s] records of the Inmate Request Forms ('IRFs'), Inmate Grievance Forms, Incident Reports, Use of Force Reports, and Disciplinary Action Reports at [Jail Central]." (Id.) Officer Diehl "ha[s] personally reviewed the GCSO's Jail records pertaining to Plaintiff." (Id., ¶ 3.) As relevant to the Motion, Officer Diehl avers:

> Attached as Exhibits No. 4 and 5, respectively, to [his] Affidavit are accurate and complete copies of all handwritten, paper IRFs and healthcare requests in the possession of the GCSO submitted by Plaintiff at Jail Central during 2018. These exhibits consist of 22 pages and 32 pages, respectively, and the requests have been placed in chronological order. Plaintiff did not submit any electronic kiosk requests in the year 2018.

11

[Officer Diehl] ha[s] personally reviewed each page of the documents included in Exhibits No. 4 and 5 to [his] Affidavit. [His] review confirms Plaintiff made **zero** medical requests as a result of the Use of Force on May 31, 2018 which refutes [Plaintiff's] allegation that the Detention Tactical Team Officers "refused to allow Plaintiff's self-initiated medical emergency requests" as he alleges in his Complaint.[5]  (DE 2 at pp. 12-13).

Of the 54 total pages of documents in Exhibits No. 4 and 5, only two relate to the Use of Force on May 31, 2018 (described in more detail below); however, none of these two documents pertain to a request by Plaintiff for medical care.[6]

- On June 8, 2018, Plaintiff requested a grievance "for cruel and unusual punishment." He alleges that on May 31, 2018 he was wrongfully slammed to the floor and beat in the face by Detention Officers. Lieutenant A. Chidester responded on June 14, 2018 and stated, "Mr. Johnson, you were found guilty of failing to follow shift directives during your disciplinary hearing. Your request for a grievance is denied." (Exhibit No. 4 at p. 4).[7]

---

5 "Plaintiff's medical record further indicates that he was seen by medical staff in Jail Central's medical facility at 10:45 p.m. on May 31, 2018." (Id. at 4 n.2.)

6 "Plaintiff made two vague healthcare requests on June 18, 2018 and October 3, 2018. Those requests stated, respectively, 'I need to talk to someone. I'm going through something and I need to know something,' and 'I need to talk to someone about something.'" (Id. at 4 n.3 (quoting Docket Entry 23-5 at 17, 27).) Officer Diehl "verified in Plaintiff's medical record that neither of these requests related to the incident on May 31, 2018." (Id.)

7 More specifically, this IRF states:

Requesting a Grievance [form] to file a complaint for cruel and unusual punishment. On 5, 31, 18 I was wrongfully slammed to the floor and beat in the face by Detention Officers. I was complying with the female officer's order to lock down, while going to my cell a D-tact Officer grabbed me I stopped acknowledged I was going to my cell, and without warning or reason they

(continued...)

12

- On June 18, 2018 Plaintiff again requests a grievance and claims his head was smashed into the door. Captain D. Best (now retired) responded on June 20, 2018 and stated, "The use of force has been reviewed and the conclusion was justified." (Exhibit No. 4 at p. 5).[8]

If Plaintiff wanted to request medical care, he needed to have complied with the GCSO Inmate Handbook Medical Assistance Procedure, which in May 2018, read as follows:

> **All inmates are entitled to medical attention when making a valid medical complaint. Inmates may request a sick call form from the nurse during medical rounds. Detention officers do not provide or receive sick call forms. The medical staff will screen all forms. The nurse will see inmates within 24 hours for legitimate medical complaints. Not all complaints will be referred to a physician. If you do not sign up for a sick call, you will not be seen, except in the event of an emergency. It is your responsibility to fill out a sick call form.**

Attached as Exhibit No. 6 to this Affidavit is a true, accurate, and complete copy of the "Inmate Handbook" published by the GCSO on February 6, 2017 and which remained in effect through July 27, 2018 when a new edition was published. The provisions in Exhibit No. 6 were in effect on May 31, 2018 (the date of the subject incident). As part of [Officer Diehl's] duties with the GCSO, [he is] personally familiar with the contents of the Inmate Handbook attached as Exhibit No. 6. The inmate grievance procedures are included at pages 26 to

---

7(...continued)
beg[a]n assaulting me, actually beating me!

(Docket Entry 23-4 at 4.)

8  In turn, this IRF states: "I want to file a complaint and I will like a grievance form y'all cannot deny me because they w[ere] wrong I was in handcuffs and he smash[ed] my head into the door and I have a statement to turn in with the form [it] happenen[ed] Friday 31 of May[.]" (Docket Entry 23-4 at 5.)

13

29 of the Inmate Handbook and would have applied to
Plaintiff on May 31, 2018.

Jail Central's grievance policy and procedure is
<u>verbally</u> explained to all inmates, including Plaintiff,
during the orientation process that takes place during
the first few days following an inmate's arrival at the
Jail. All inmates, including Plaintiff, are also
informed that a copy of the Inmate Handbook contains a
<u>written</u> description the grievance policy and procedure,
and that the Inmate Handbook is available in all inmate
housing units to read and use, upon request.
Specifically, the written description of the grievance
procedure and policy is found at pages 26 - 29 of Exhibit
No. 6 to this Affidavit.

The purpose of Jail Central's Grievance Policy is
three-fold. First, it provides each inmate with an
outlet for voicing complaints. Second, it provides Jail
Staff the opportunity to act on and resolve inmate
complaints in-house, promptly, and at the lowest level
possible without resorting to litigation. Third, it
allows command staff to track, assign, and monitor inmate
requests and inmate grievances.

Inmates confined at Jail Central could submit
written requests to the Jail's Staff through one of two
means: (a) electronically through computer kiosks
located in each housing unit, or (b) in handwriting by
asking their Floor Officer for a document known as an
[IRF]. The [GCSO] utilizes the "Jail ATM" brand of
computer kiosks as an internal method of electronic
communication system between inmates and Staff. As a
general rule, all inmates have access to these electronic
kiosks with the exception of those inmates in a
disciplinary status. Inmates in a disciplinary status
could, however, utilize the handwritten, paper IRFs as an
alternative means to submit requests.

Electronically-submitted kiosk requests and
handwritten IRFs are used by inmates to ask for routine,
general information or jail services, such as court
dates, access·to the jail law library, religious
materials, or indigent inmate basic provision kits.
Electronically-submitted kiosk requests and handwritten,
paper requests (IRFs) are typically answered by the
Detention Staff within five (5) business days, although
Floor Officers are often able to informally resolve many

14

requests, upon receipt. Electronically-submitted kiosk requests are retained and stored on a computer server at the Jail. Paper IRFs are retained in the inmate's Jail file. Inmates who submit a handwritten, paper IRF are provided a copy of the paper form to maintain for their own records.

As described in pages 26 - 29 of the Inmate Handbook attached as Exhibit No. 6 to [Officer Diehl's] Affidavit, inmates may initiate the grievance process with a complaint made verbally or in writing. When there is a complaint, a Jail Staff member (usually the Floor Officer) will attempt to resolve the matter informally for the inmate. If the initial Jail Staff member is unable to provide a satisfactory remedy for the complaint, the complaining inmate may submit a request for assistance in resolving the complaint. These requests can be submitted electronically via a kiosk or in handwriting via the paper IRF. Requests are responded to by a higher-ranking Detention Staff Member who is above the Floor Officer in the Jail's chain of command. Repetitious IRFs are not allowed and will be returned to the inmate indicating that it has been rejected for that reason. If the inmate is not satisfied with the response to his or her electronic or handwritten request, then the inmate must request a Grievance Form. Requests for Grievance Forms can also be submitted electronically via a kiosk or through a handwritten IRF.

An inmate's request for a Grievance Form will be reviewed by Detention Staff. If the inmate has previously attempted to resolve the complaint (albeit unsuccessfully) and identifies a complaint that is subject to the grievance process by stating the matter to be grieved and detailing how the inmate has complied with the foregoing requirements, the inmate will be issued a Grievance Form by the Shift Commander or Classification/Grievance Officer, who shall affix a date/time stamp to the Grievance Form. All forms associated with the Grievance Policy are produced and distributed to inmates in "carbon copy" format, allowing the inmate to retain for his/her records a copy of each form submitted as a part of this process.

As reflected on page 28 of the Inmate Handbook attached as Exhibit No. 6, the issues over which an inmate may file a grievance are broad and include: (a) Jail policy and procedure; (b) living conditions

15

inside the Jail; (c) actions of Jail Staff or other inmates; (d) incidents which personally impact that inmate; and (e) allegations of reprisal or retaliation for the inmate's use of the grievance procedure. Inmate complaints of alleged lack of medical treatment by the Detention Staff would fall under subsection (c) above — "actions of Jail Staff". Hence, under Jail Central's grievance policy and procedure, Plaintiff could, had he chosen to do so, have filed a grievance concerning the May 31, 2018 incident regarding lack of medical care that is, in part, the subject of this lawsuit.

As a general rule, and as described on pages 26 - 28 of the Inmate Handbook attached as Exhibit No. 6, an inmate must submit his/her Grievance Form within three days from the date of the incident complained of, or within three days of learning that grounds for a complaint exist. A grievance will also be deemed timely if the inmate initiates the grievance process within three days of the incident complained of and then submits his/her Grievance Form within three days of receiving that form from the Jail's Staff. These time limits are imposed to ensure that inmate complaints are resolved in [a] prompt manner and when the evidence and information concerning the incident is still available and fresh in the minds of those involved. <u>An inmate's failure to satisfy these timelines for initiating the grievance process is considered a failure to comply with the Jail's grievance procedure.</u>

Based on [Officer Diehl's] review of the documents contained in Exhibit Nos. 4 and 5 to [his] Affidavit, and as described in Paragraph 12 above, Plaintiff did initiate the Jail's grievance process by submitting a request for a grievance to complain about the force used on him on May 31, 2018. Plaintiff did not, however, submit a request or initiate the grievance process concerning his allegations of a denial of medical treatment.

(Docket Entry 23, ¶¶ 10-23 (emphasis and certain formatting in original) (internal paragraph numbering and certain emphasis omitted); <u>see also</u> Docket Entries 23-4, 23-5.)

16

As noted above, Officer Smith also submitted video footage from Plaintiff's housing unit and the body camera of one of the officers involved in the incident. (See, e.g., Docket Entry 24 at 1.) The housing video, which lacks sound, starts at 18:28:25 on May 31, 2018. It shows a unit with angled walls with multiple doors (largely to inmate cells) and/or windows along the right wall. Only the portion of the left wall immediately adjacent to the (off-camera) unit entrance remains visible; it contains a solid metal door, a metal cage, and the corner of a cinderblock wall. Based on the trajectory and positioning of officers in the video, it appears that the unit curves away to the left beyond that corner. The foreground of the video shows empty space between the walls, but the rear portion of the video includes three columns and a metal stairwell.[9] The first column appears halfway down the unit and the last column stands slightly in front of the metal staircase, which leads to a barely visible upper floor. At least one table occupies the space between the rear column and the middle column, which holds at least one telephone. A chest-high, solid desk supporting a computer sits between the front column and the middle column, with a table in the area between and to the left of the middle (telephone) column and the desk.

As the video starts, two inmates appear near the rear of the unit, with one (Plaintiff) using a telephone affixed to the middle

---

9  The rear wall of the unit appears to contain windows.

17

column.  At least one officer stands near those inmates while two other officers stand between them and the off-screen cell to the left of the housing unit where the request for assistance apparently originated.  Three additional officers enter the unit, two of whom head towards that cell and the third of whom stops, at 18:28:31, at the table between Plaintiff and the left side of the unit.  The other inmate walks past Plaintiff and towards the cell (5E-19) at the bottom right foreground of the video, entering that cell at 18:28:39, just as Officer Smith enters the unit and draws even with that cell door.  Plaintiff remains on the telephone for the initial portion of that inmate's walk from the rear of the unit towards the front.

At 18:28:30, Officer Sherrod approaches Plaintiff, who, at 18:28:32, hangs up the telephone as Officer Sherrod lays hands on Plaintiff's back and right arm.  They start walking away from the telephone towards the officers' desk, and, at 18:28:33, Plaintiff pulls his right elbow away from Officer Sherrod, who keeps hold of the upper portion of Plaintiff's right arm.  Plaintiff appears to look over his shoulder at Officer Sherrod, slightly angling his body, as they walk towards the desk; as it blocks their continued forward motion, Plaintiff turns fully to his right, with Officer Sherrod slightly behind and to his right, and walks around the desk at 18:28:39.  As Plaintiff draws even with the corner of the desk, he turns to his left so that he faces the front of the unit,

18

before, as he continues to round the corner of desk on the path towards his cell, turning farther to his left towards an officer who approached and placed her hand on Plaintiff's back. By 18:28:41, at least eight additional officers, including Officer Smith, have run into the unit, with the majority converging on Plaintiff and the officers at the desk. At 18:28:42, Officer Smith draws even with and then passes Plaintiff on his way towards the cell at the left of the unit from which the assistance request originated.

The other officers largely obscure the view, but, by 18:28:43, officers have begun pushing Plaintiff towards the ground. They push him so hard that, when he first hits the ground roughly halfway between the first column and the video foreground, his head and upper torso visibly bounce several inches to a foot off the floor, repeatedly, as he skids on his back to within a couple feet of the right wall (and his cell door). His empty orange flipflops remain visible, one almost even with the first column and the other several feet farther away, in the middle of the unit floor, several feet away from where Plaintiff came to rest, at 18:28:47, on the ground near the right wall. At least fifteen officers surround Plaintiff, often obscuring the view, but by 18:28:57, the video reveals Plaintiff laying on his left side on the floor, with his left hand in the vicinity of his face as an officer appears to lie on top of his upper torso, pushing down on Plaintiff's left arm.

19

The officer appears to be pressing down on Plaintiff's neck or shoulder area with his forearm. At 18:29:05, the officer shifts his hand to the side of Plaintiff's neck and grabs Plaintiff's right arm, positioned in front of Plaintiff's chest. Plaintiff appears to hold that arm against his chest as the officer pulls at it. By 18:29:09, an officer stands in front of Plaintiff, blocking the view of the camera. Meanwhile, twenty-one additional officers enter the unit, congregating around Plaintiff.[10] These officers further obstruct the view of Plaintiff.

Meanwhile, from roughly 18:28:45 until 18:28:54, Officer Smith stands at the left edge of the video, roughly even with the table and column containing the telephone.[11] At 18:28:54, he turns and hurries to a room with a solid metal door on the right side of the unit, arriving at 18:28:58. After another officer unlocks the door at 18:29:00, Officer Smith enters the room and, at 18:29:02, begins exiting the room holding a metal chain with shackles. Officer Smith walks up to the group surrounding Plaintiff, arriving to stand near Plaintiff's feet by 18:29:09. Officer Smith works to untangle the chain until 18:29:22, at which point he starts walking up behind other officers to stand near Plaintiff's head. Officer

---

10  By this point, approximately 40 officers have gathered in Plaintiff's vicinity.

11  From the time that he passed Plaintiff until at least 18:28:49, Officer Smith did not look in the direction of Plaintiff and/or the activity surrounding Plaintiff.

20

Smith continues to fiddle with the chain until 18:29:36, at which point he waves his right arm in the air. Officers begin leaving the unit, temporarily revealing Plaintiff on the ground with multiple officers holding onto him. Officer Smith remains standing and walks back towards Plaintiff's feet, arriving around 18:29:50, before another officer, at 18:29:51, obstructs the view of Plaintiff. At 18:29:58, Officer Smith kneels down at Plaintiff's feet, behind another officer who largely obscures the view of Officer Smith. However, it appears that, until 18:30:33, Officer Smith manipulates the chain and shackles.

At 18:30:34, Officer Smith stands up before kneeling back down at 18:30:36, at which point some of the other officers start standing upright, pulling Plaintiff up as they rise. Three officers hold Plaintiff off the ground before placing him up against his cell door and the unit wall; as they move him towards the cell door and wall, he appears to place his feet on the ground. In part due to the positioning of another officer, the video does not reveal how much force the officers use in placing Plaintiff against the wall, but it appears that Plaintiff encounters the wall face-first. During this maneuvering, Officer Smith holds onto a chain around Plaintiff's waist, following the officers and Plaintiff as they move to the wall. By 18:30:43, Plaintiff stands against the wall with Officer Smith behind him and other officers holding onto his upper torso. Officers obscure the view of Officer

21

Smith's actions, but, at 18:30:52, Plaintiff slides down the wall and, at 18:30:53, officers lift him up, sliding him upwards higher than he originally stood. The video shows at least one of Plaintiff's feet temporarily elevated behind him several feet off the floor after his head becomes visible again above the officers' heads.

At 18:31:04, seeming in search of something, Officer Smith turns his upper body to the right briefly before turning back to face Plaintiff and then pivoting his upper body to his left, at 18:31:08, to look behind him at some of the milling officers. At 18:31:13, one of those officers hands what appears to be a pair of handcuffs to the officer on Officer Smith's left holding Plaintiff. Officer Smith looks to his left and points while Plaintiff's upper body moves about a foot or so away from the wall before other officers press his head back against the wall. After Officer Smith looks back in Plaintiff's direction, other officers appear to lift Plaintiff higher off the ground, with one holding onto the back of his head and Plaintiff's face pressed against the wall; throughout this maneuvering, Officer Smith's gaze appears fixed at the level of Plaintiff's waist. Plaintiff then appears to slide down the wall before an officer adjusts his grip to hold onto the back of Plaintiff's neck. Aside from an impression of motion, the video reveals little of the ongoing activity, due in part to the positioning of officers watching the incident.

For approximately ten seconds beginning at 18:31:38, Plaintiff disappears from view, apparently sinking down towards the ground before standing upright as two officers, holding Plaintiff's arms and neck, pivot with him to face towards the unit door. Plaintiff appears to stumble to his knees, prompting Officer Smith to pick up his feet at 18:31:56 so that the officers can carry Plaintiff (face-down) from the unit. At 18:32:00, they turn Plaintiff around so that Officer Smith takes point, carrying Plaintiff's feet as they walk out of view at 18:32:03. Eleven officers follow them out of the unit. As the others depart the unit, one of the remaining officers picks up Plaintiff's flipflops and subsequently places them in his cell (5E-18).

For its part, Sergeant Nelson's body camera (which contains sound) begins at 6:29:06 p.m. on May 31, 2018, as multiple officers hold Plaintiff to the ground. As one officer holds Plaintiff's feet, another officer grips Plaintiff's neck while a third officer leans on Plaintiff gripping Plaintiff's right arm as Sergeant Nelson loudly orders, "put them behind your back" and "stop resisting." Sergeant Nelson leans down and grabs Plaintiff, who denies resistence. Sergeant Nelson yells at Plaintiff to "put [his] other one behind [his] back **now**!" as the video shows officers holding one of Plaintiff's hands behind his back. Plaintiff again denies resistence and Sergeant Nelson directs him to put his hand behind his back, prompting Plaintiff to declare that he "can't

23

move." By 6:29:40, officers hold Plaintiff's hands behind his back as he lies on his stomach. The video shows officers holding Plaintiff down as he laments, "I didn't even do nothing." At 6:29:53, an officer says to "lift him up," to which Sergeant Nelson responds, at 6:29:55, "get his feet first." Sergeant Nelson tells someone to "give me them cuffs" and then applies handcuffs to Plaintiff's crossed arms.

From approximately 6:30:11 to 6:30:23, the video reveals Officer Smith kneeling near Plaintiff's feet as he moves a chain around, apparently applying restraints to Plaintiff's ankles.[12] At 6:30:26, Officer Smith releases Plaintiff's ankles and reaches for a chain as Sergeant Nelson says, "hold his legs . . . we're going to pick him up." As Sergeant Nelson counts to three, officers lift Plaintiff to his feet at 6:30:31. As they finish lifting Plaintiff upright at 6:30:34, Sergeant Nelson says to "put him against the wall." Officer Smith wraps and then holds a chain encircling Plaintiff's waist as the other officers lift and move Plaintiff. By 6:30:37, officers have placed Plaintiff against the wall; the video does not suggest that the officers used significant force in doing so. The angle of the video does not clearly reveal Officer Smith's actions, but it appears that he continues fastening restraints around Plaintiff from 6:30:39 to at least 6:30:45, at

---

12 An officer kneeling on Plaintiff's back partially obstructs the view of Officer Smith.

24

which point Plaintiff says, "just go ahead and kill me" and slides down the wall.  Officers lift Plaintiff upright as Officer Smith continues fastening the restraints.

A few officers hold Plaintiff on his upper back and/or neck. By 6:30:51, Plaintiff starts breathing heavily and Sergeant Nelson instructs him not to spit.  At 6:30:54, Plaintiff says, "you're choking me" in a distressed voice.  Plaintiff continues breathing laboredly and complaining of choking before, at 6:31:03, he starts coughing.  Plaintiff becomes more and more distressed, starting to cry and lament about officers choking him and telling them to "go ahead and kill [him]" as Sergeant Nelson repeatedly orders him to "relax."  Officer Smith continues working on the restraints at Plaintiff's waist (which do not appear tight enough to interfere with Plaintiff's breathing) until, at 6:31:26, Plaintiff's jumpsuit obscures the entire camera lens.  Plaintiff continues crying and saying "why are you all killing me" and "y'all killing me" as Sergeant Nelson orders him to relax.  Beginning around 6:31:42, someone says to "walk him out" as the video shows Plaintiff disappearing towards the ground out of the camera view while he continues to cry and accuse the officers of killing him.  At 6:31:50, Plaintiff says that he "can't move."  The video then shows an officer holding Plaintiff off the ground in a prone position with a grip around his left arm.

At 6:31:51, the video shows Officer Smith holding Plaintiff's feet off the ground while Sergeant Nelson instructs "feet first." The officers turn as they walk towards the unit door, such that, at 6:31:58, Officer Smith walks backwards out the unit door holding Plaintiff's feet off the ground. The video then mainly shows Officer Smith walking backwards holding Plaintiff's feet through various hallways until, around 6:32:23, they begin entering an elevator. The officers place Plaintiff on the elevator floor, still in a face-down prone position, until they arrive at their destination. The video does not show Plaintiff during much of the elevator ride, but, at 6:33:15, the officers arrive at their desired level and lift Plaintiff, still in the face-down prone position, off the elevator floor. As they exit the elevator door, Sergeant Nelson says, "feet first" and they pivot so that Officer Smith resumes point position, walking backwards while holding Plaintiff's feet. The video shows infrequent glimpses of Plaintiff as they carry him through various hallways, but as they approach a room at the end of the hallway, Sergeant Nelson says, "you little shit" before he instructs another officer to "grab his arm" and transfers responsibility for carrying Plaintiff to another officer. The video then shows three officers carrying Plaintiff through a waiting area before, beginning around 6:34:18, they stop in a doorway to another area with individual cells, placing Plaintiff on the ground in the entranceway.

26

Another officer steps through the doorway on his way to unlock a holding cell. Around 6:34:43, officers pick Plaintiff up and carry him into a cell at the rear of the area. The adjacent cell also contains an inmate and various officers, whom Sergeant Nelson approaches. From 6:34:49 to 6:35:59, the video shows only limited glimpses of Plaintiff and/or the officers in his immediate vicinity, as Sergeant Nelson approaches and interacts with the occupants of the adjacent cell and then walks to the entranceway to the holding cell area. Around 6:35:21, one of the officers in the adjacent cell asks if Sergeant Nelson can get "a nurse to come down and check his restraints." After agreeing, Sergeant Nelson walks to the entranceway, radioing around 6:35:32 for a nurse to "check multiple sets of restraints at the booking desk." At 6:35:43, the video reveals Plaintiff lying face-down on the floor of a holding cell. At 6:35:54, Sergeant Nelson asks if they "ever hooked his hands up," to which Officer Smith responds, "I didn't get a chance to put the belly chain on" and offers "to put [that] on now." At 6:36:13, Sergeant Nelson states that they can "probably" remove Plaintiff's restraints and then, at 6:36:16, asks Plaintiff if he will "act like [he's] got sense" if they remove his restraints. After Plaintiff fails to verbally respond, Sergeant Nelson says that they "will leave him [how] he is."

During this interaction, Officer Smith bends over Plaintiff, calling his name and asking if he can hear and identify Officer

27

Smith. Plaintiff merely cries softly, not saying anything. The officers stand around looking at Plaintiff and each other, before, at approximately 6:37:20, Officer Sherrod starts explaining what happened to instigate the situation with Plaintiff. At 6:37:41, a nurse enters the holding cell and bends down to check on Plaintiff. She asks if he is bleeding, to which Sergeant Nelson responds no and then offers to "roll him over" for her to examine him. As Officer Smith bends down, apparently turning Plaintiff onto his back, the nurse asks Plaintiff what happened. Continuing to cry, Plaintiff does not respond to her. She kneels down to check him over before asking Officer Smith to pick Plaintiff up. Officer Smith and another officer lift Plaintiff upright, leaning him against a chest-high wall in the middle of the cell before standing him against the wall. The officers appear to hold Plaintiff up, repeatedly asking if he can stand before the nurse temporarily exits the cell and the officers attempt to get Plaintiff to sit on a bench affixed to the wall. The video reveals a glimpse of Plaintiff's face while the officers hold him upright. Although brief and from a relative distance, the glimpse of Plaintiff's face does not suggest any bleeding or clearly visible injury. The video then shows officers attempting to get Plaintiff to sit on the beach; although an officer's back obscures the view of Plaintiff, the officers, including Officer Smith, repeatedly tell Plaintiff to

28

sit, with Officer Smith saying, "nobody's trying to hurt you." Plaintiff, in turn, simply cries harder.

At 6:39:38, Sergeant Nelson says to put Plaintiff on the floor instead; a few seconds later, the video shows a glimpse of Plaintiff apparently lying on the bench while sobbing. At 6:39:55, the nurse reenters the cell and approaches Plaintiff, repeatedly asking if he will "sit up for [her]." The video shows the nurse bending over, asking Plaintiff his name and if she can take his blood pressure. Although Plaintiff remains off-camera, the video audio indicates that the nurse takes Plaintiff's blood pressure. The nurse then puts her stethoscope back around her neck, removes the blood pressure cuff, and repeatedly asks Plaintiff if he can sit up. As she continues examining him, Plaintiff apparently slides to the floor, with the video thereafter revealing an empty bench. She notes that "his heart rate's up a little" but his "oxygen level's 100," and she tells Plaintiff, "you're fine, come on, sit up for me." When Plaintiff fails to sit up, one of the officers says they will just leave him there and the nurse says, "His vitals are ok" before exiting the cell. Sergeant Nelson follows her out of the cell and the video ends at 6:42:04, with no further glimpse of Plaintiff.

29

**DISCUSSION**

## I. Relevant Standards

### A. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[13]  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The movant bears the burden of establishing the absence of such dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc)

---

13   "[I]n considering a motion for summary judgment, the district court *must* review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." Robinson v. Wix Filtration Corp., 599 F.3d 403, 409 n. 8 (4th Cir. 2010) (emphasis in original) (internal quotation marks omitted).

(brackets in original) (quoting <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 959 (4th Cir. 1996).

Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." <u>Lewis v. Eagleton</u>, No. 4:08-cv-2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing <u>Baber v. Hospital Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992)), <u>aff'd</u>, 404 F. App'x 740 (4th Cir. 2010); <u>see also</u> <u>Pronin v. Johnson</u>, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Further, factual allegations in a complaint or other court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. <u>See</u> <u>Reeves v. Hubbard</u>, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), <u>recommendation adopted</u>, slip op. (M.D.N.C. Nov. 21, 2011).

## B. Excessive Force Standards

Both pretrial detainees and convicted prisoners possess constitutional protections against an officer's use of excessive force: a convicted prisoner under the Cruel and Unusual Punishment Clause of the Eighth Amendment and a pretrial detainee under the Due Process Clause of the Fourteenth Amendment. See Kingsley v. Hendrickson, 576 U.S. 389, 400 (2015); see also, e.g., Graham v. Connor, 490 U.S. 386, 395 n.10 (1989) (explaining that, "[a]fter conviction, the Eighth Amendment serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified," but "that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment" (internal quotation marks omitted) (ellipses in original)). "The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" Kingsley, 576 U.S. at 400. Accordingly, to succeed on an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Id. at 396–97.

The Supreme Court identified certain considerations that "may bear on the reasonableness or unreasonableness of the force used," namely:

> the relationship between the need for the use of force
> and the amount of force used; the extent of the
> plaintiff's injury; any effort made by the officer to
> temper or to limit the amount of force; the severity of
> the security problem at issue; the threat reasonably
> perceived by the officer; and whether the plaintiff was
> actively resisting.

Id. at 397. Courts must assess objective reasonableness "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. Courts must also account for the government's legitimate interests in managing the facility, "appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." Id. (brackets in original) (internal quotation marks omitted).

Further, in assessing objective reasonableness, a court should view the use of force "in full context, with an eye toward the proportionality of the force in light of all the circumstances." Smith v. Ray, 781 F.3d 95, 101-02 (4th Cir. 2015) (internal quotation marks omitted) (reiterating rejection of "argu[ment] that [courts] should take a 'segmented view of the sequence of events' and hold that each step taken by the officer was reasonable based on [the plaintiff's] immediately preceding actions"). Nevertheless, "[i]n considering the reasonableness of an officer's actions, [the Court] must consider the facts at the moment that the challenged force was employed." Id. at 101. Notably, "the

33

reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds." Harris v. Pittman, 927 F.3d 266, 274 (4th Cir. 2019) (internal quotation marks omitted). In this regard, the United States Court of Appeals for the Fourth Circuit "ha[s] made clear that the justification for using protective force expires at the very moment a threat is neutralized." Dean v. Jones, 984 F.3d 295, 305 (4th Cir. 2021) (explaining that, "[o]nce [the plaintiff] was subdued and [the defendant officer] no longer had reason to fear for officer or public safety, the use of force became unnecessary and unjustified — even if all of that transpired merely seconds after [the plaintiff] head-butted [the defendant officer]"); see also, e.g., Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.").

### C. Medical Deliberate Indifference Claims

Unlike in the excessive force context, courts have traditionally held that to establish a constitutional claim regarding medical care, an inmate must show that a prison official "acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (citing Estelle v. Gamble, 429 U.S. 97, 104

34

(1976)).[14]  A medical need qualifies as serious if it "has been

diagnosed by a physician as mandating treatment or . . . is so

obvious that even a lay person would easily recognize the necessity

for a doctor's attention."  Id. (internal quotation marks omitted).

A defendant displays deliberate indifference where he possesses

knowledge of the risk of harm to an inmate and knows that "his

14  By holding that an objective standard of reasonableness applies to a pretrial detainee's excessive force claim under the Due Process Clause of the Fourteenth Amendment, the Kingsley decision calls into question whether an objective reasonableness standard applies to a pretrial detainee's claim that his medical treatment violated the Fourteenth Amendment's Due Process Clause. See, e.g., Darnell v. Pineiro, 849 F.3d 17, 30, 33-35 (2d Cir. 2017) ("conclud[ing] that the Supreme Court's decision in Kingsley altered the standard for deliberate indifference claims under the Due Process Clause," overruling decision applying subjective standard to medical deliberate indifference claim, and holding that, in light of Kingsley, an objective standard of deliberate indifference applies in due process cases).  The Fourth Circuit has not yet considered whether Kingsley's reasoning extends to medical deliberate indifference claims.  See Mays v. Sprinkle, 992 F.3d 295, 301 (4th Cir. 2021) ("We had not decided whether Kingsley's excessive-force-claim rationale extended to deliberate-indifference claims by the time Mays[, a pretrial detainee,] died [in 2016]. And we still have not.  Both before and after Mays's death, we said a pretrial-detainee-medical-deliberate-indifference claim required both an objectively serious medical condition and subjective knowledge of the condition and the excessive risk posed from inaction."); see also id. at 301 n.4 (discussing circuit split on post-Kingsley pretrial detainee medical claims) (collecting cases). However, the Court need not resolve whether an objective standard of reasonableness applies to Plaintiff's claim, for (as discussed below) Plaintiff failed to exhaust his administrative remedies regarding his medical claim.  See, e.g., Nam Dang by & through Vina Dang v. Sheriff, Seminole Cnty. Fla., 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (declining to consider Kingsley's implications for deliberate indifference claim because, inter alia, "regardless of whether Kingsley could be construed to have affected the standard for pretrial detainees' claims involving inadequate medical treatment due to deliberate indifference, whatever any resulting standard might be, it could not affect [the plaintiff's] case").

35

actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." Id. (emphasis and internal quotation marks omitted); see also Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" (brackets in original) (quoting Farmer, 511 U.S. at 837)).

"[D]eliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted). A plaintiff can satisfy this standard by showing "that a [defendant] knew of a substantial risk from the very fact that the risk was obvious." Scinto, 841 F.3d at 226 (internal quotation marks omitted). In addition, "'[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs.'" Id. (brackets in original) (quoting Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir. 1990), overruled in part on other grounds by Farmer, 511 U.S. at 837).

36

## D. Exhaustion Requirement

Finally, as Plaintiff initiated this action as an NCDPS inmate challenging conditions he experienced while detained in a jail (see, e.g., Docket Entry 2 at 4, 12-13), the Prison Litigation Reform Act (the "PLRA") applies. Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion "is mandatory" and courts lack discretion to waive the exhaustion requirement. Woodford v. Ngo, 548 U.S. 81, 85 (2006). Moreover, the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). The defendant bears the burden of establishing that a prisoner failed to exhaust administrative remedies. See Jones v. Bock, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

Nevertheless, the "exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge." Drippe v. Tobelinski, 604 F.3d 778, 782 (3d Cir. 2010); see also

<u>Woodhouse v. Duncan</u>, 741 F. App'x 177, 178 (4th Cir. 2018) ("'[J]udges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury.'" (brackets in original) (quoting <u>Small v. Camden Cnty.</u>, 728 F.3d 265, 271 (3d Cir. 2013))); <u>Lee v. Willey</u>, 789 F.3d 673, 677 (6th Cir. 2015) ("[A]ll . . . of the circuits that have considered the issue agree that judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." (internal quotation marks omitted)). A prisoner satisfies the PLRA exhaustion requirement when he "ha[s] utilized all available remedies 'in accordance with the applicable procedural rules,' so that prison officials have been given an opportunity to address the claims administratively." <u>Moore v. Bennette</u>, 517 F.3d 717, 725 (4th Cir. 2008) (quoting <u>Woodford</u>, 548 U.S. at 88). Thus, the relevant facility's grievance procedures determine the steps that a prisoner must take to meet his exhaustion obligations. <u>See</u> <u>id.</u> at 726.

Because prisoners must comply with the applicable grievance policy, they fail to properly exhaust when they miss grievance policy deadlines. <u>See</u> <u>Jones</u>, 549 U.S. at 217–18 ("*Woodford* held that 'proper exhaustion' was required under the PLRA, and that this requirement was not satisfied when grievances were dismissed because prisoners had missed deadlines set by the grievance policy."); <u>Woodhouse</u>, 741 F. App'x at 178 ("The PLRA 'requires proper exhaustion,' which 'means using all steps that the agency

38

holds out, and doing so *properly*,' to allow the agency a full and fair opportunity to address the issues on the merits. 'Proper exhaustion,' therefore, 'demands compliance with an agency's deadlines and other critical procedural rules.'" (emphasis in original) (citation omitted)). Moreover, prisoners must exhaust their administrative remedies even if the administrative process does not offer the type of relief that they seek, such as monetary damages. See Booth v. Churner, 532 U.S. 731, 736-41 (2001).

However, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore, 517 F.3d at 725. In this regard, the Supreme Court has identified three circumstances wherein an administrative remedy qualifies as unavailable: (1) "it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it remains "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross v. Blake, 578 U.S. 632, 643-44 (2016). "The burden of showing that administrative remedies were unavailable lies with the plaintiff." Mann v. Scott, Civil Action No. 0:14-3474, 2015 WL 5165198, at *4 (D.S.C. Sept. 1, 2015) (citing Graham v. Gentry, 413 F. App'x 660, 663 (4th Cir. 2011)); see also Gentry, 413 F. App'x at 663 ("[I]n

order to show that a grievance procedure was not 'available,' a prisoner must adduce facts showing that he was prevented, through no fault of his own, from availing himself of that procedure.").

## II. Analysis

### A. Medical Deliberate Indifference Claim

As a preliminary matter, Officer Smith asserts that "Plaintiff failed to exhaust his administrative remedies" regarding his medical deliberate indifference claim. (Docket Entry 21 at 21.) In this regard, Officer Diehl's affidavit details that the GCSO obliges inmates to initiate the grievance process "within three days from the date of the incident complained of, or within three days of learning that grounds for a complaint exist." (Docket Entry 23, ¶ 22.) An inmate must first attempt an informal resolution of his issue. (See Docket Entry 23-6 at 26-27; see also Docket Entry 23, ¶ 19.) If that informal resolution fails to solve the issue, the grievance process requires "the inmate [to] submit an [IRF] requesting a grievance form, stating the matter to be grieved, and detailing how the inmate has complied with the [GCSO's informal resolution process]." (Docket Entry 23-6 at 27.)

In support of the Motion, Officer Smith (through Officer Diehl) provided Plaintiff's IRFs and medical request forms from 2018. (See Docket Entries 23-4, 23-5; see also Docket Entry 23, ¶ 10 (averring that such documents contain "accurate and complete copies of all handwritten, paper IRFs and healthcare requests in

40

the possession of the GCSO submitted by Plaintiff at Jail Central during 2018" and that "Plaintiff did not submit any electronic kiosk requests in the year 2018" (emphasis omitted)).) These materials include two IRFs in which Plaintiff complains about officers' use of force on May 31, 2018. (See Docket Entry 23-4 at 4-5.) These IRFs do not mention anything regarding the medical care — or lack thereof — provided to Plaintiff in connection with the incident on May 31, 2018. (See id.) After May 31, 2018, Plaintiff also submitted six medical request forms in which he indicates a need to "talk to someone" or "see someone." (Docket Entry 23-5 at 16-18, 21, 23, 27.) Four of the requests reflect the topic he would like to address with that "someone" (id. at 16 (seeing his grandmother), 18 (seeing snakes), 21 (hearing his "name being called"), 23 (medication needs)), none of which involve a need for medical care related to the incident on May 31, 2018. The remaining two requests do not indicate the topic of discussion, but state as the healthcare staff's "Response to Patient/Comment" to "see note in ERMA." (Id. at 17, 27 (emphasis omitted).) Officer Diehl avers that he "verified in Plaintiff's medical record that neither of these requests related to the incident on May 31, 2018." (Docket Entry 23 at 5 n.3 (emphasis omitted); see id. at 4 n.3.)

Accordingly, these IRFs and medical request forms do not "alert the prison to the nature of the wrong for which [Plaintiff seeks] redress" through his medical deliberate indifference claim

41

and thus do not satisfy the administrative exhaustion requirement for that claim. <u>Wilcox v. Brown</u>, 877 F.3d 161, 167 n.4 (4th Cir. 2017) (brackets and internal quotation marks omitted). Moreover, although the Complaint alleges interference with Plaintiff's grievance attempts (<u>see</u> Docket Entry 2 at 7-8, 13), (1) the alleged interference appears related to attempts to grieve his excessive force claim (<u>see</u> <u>id.</u>) and (2) Plaintiff provides only unsworn allegations, not admissible evidence, regarding such incidents (<u>see</u> <u>generally</u> Docket Entry 2; <u>see also</u> Docket Entries dated May 18, 2022, to present (lacking response to Motion)). As such, Plaintiff has not "adduce[d] facts showing that he was prevented, through no fault of his own, from availing himself of th[e grievance] procedure," as required "to show that [the] grievance procedure was not 'available.'" <u>Gentry</u>, 413 F. App'x at 663. Because the record thus establishes that Plaintiff failed to "submit a request or initiate the grievance process concerning his allegations of a denial of medical treatment" (Docket Entry 23, ¶ 23), the Court should dismiss this claim without prejudice for failure to exhaust administrative remedies.

### B. Individual-Capacity Excessive Force Claim

Officer Smith next urges dismissal of Plaintiff's individual-capacity excessive force claim on the grounds that "the only named Defendant[, Officer] Smith[,] did not engage in th[e] alleged

42

conduct." (Docket Entry 21 at 14 (emphasis omitted).) This position should prevail.

In his unverified Complaint, Plaintiff alleges that, when responding to an incident involving another inmate in Plaintiff's unit, "D-TAC without provocation came at Plaintiff slamming him onto the concrete floor and began to beat Plaintiff about his head and upper-body while the altercation for which they were deployed was still going on in another cell." (Docket Entry 2 at 12.) The Complaint further alleges that, although Plaintiff remained completely compliant and nonaggressive, "said officers still continued to use unreasonable excessive force upon Plaintiff by placing him in handcuffs and then slamming his head against a cell door which caused [various visible injuries]." (Id.) Finally, the Complaint alleges that "[Plaintiff's] head was bloody from them slamming [him] into the wall while [he] was in handcuffs [and that] D-TAC Smith grabbed the C.O. that slammed [Plaintiff's] head into the door ma[king him] bleed in the middle of [his] forehead." (Id. at 13.) Notably, however, because Plaintiff did not swear to the truthfulness of or otherwise submit these allegations under penalty of perjury (see id. at 1-13), they do not constitute evidence for summary judgment purposes, Reeves, 2011 WL 4499099, at *5 n.14.

Conversely, Officer Smith avers that, when he entered Plaintiff's unit in response to a Signal Zero distress call, he "proceeded to the left side of the room to the cell where the

Signal Zero was called," approaching that cell "while Plaintiff was simultaneously taken to the ground by other Detention Officers, not including [Officer Smith]. [Officer Smith] played no role in bringing Plaintiff to the ground." (Docket Entry 22, ¶ 7 (emphasis omitted).) Officer Smith further avers that, while he retrieved and untangled restraints, Plaintiff resisted efforts to handcuff him, resulting in two officers applying "suprascapular strikes" to "cause[] Plaintiff to release his arms and be handcuffed without resulting in physical injury to Plaintiff or the Detention Officers." (Id., ¶ 8.) Additionally, Officer Smith avers:

> At 6:29:58 p.m., [he] kneeled and began placing leg shackles around both of Plaintiff's ankles while another Officer held his legs crossed. As shown on the video, [Officer Smith] do[es] so in a non-violent, professional, and respectful manner. At 6:30:38 p.m., [Officer Smith] stood up while other Detention Officers brought Plaintiff to his feet and then up against the wall so that a waist chain could be secured around Plaintiff's body. Plaintiff continued to not follow orders and refused to put his feet on the ground and this position (i.e., up against the wall) allowed Officers to have better control so that [Officer Smith] could secure the waist chain. At 6:30:40 p.m., Plaintiff attempted to drop to his knees. Plaintiff was assisted back to his feet by the other Officers while they maintained control of his head and neck area.
>
> The force used by the other Detention Officers in taking Plaintiff to the ground, delivering the suprascapular strikes, and placing Plaintiff against the wall was reasonable and necessary to restrain the uncooperative Plaintiff. Further, the force was proportionate to Plaintiff's level of physical resistance. In [Officer Smith's] assessment, the force used by the other Officers was limited to the amount necessary to keep Plaintiff under control and keep him from harming the other Officers or inadvertently injuring himself. Because [Officer Smith] deemed the force used

44

by [his] fellow Officers to be legal, necessary and reasonable, there was no need for [him] to intervene in their actions.

At 6:31:49 p.m., [Officer Smith] completed securing the waist chain. At 6:31:56 p.m., Plaintiff refused to walk out of the housing unit. [Officer Smith] then took hold of Plaintiff's feet and lifted him by both of his legs to carry him to Main Floor Holding Cell 6. Other Officers carried Plaintiff's upper half by securing his arms and torso. As [they] did so, [they] were careful to make sure Plaintiff's head and body did not come into contact with walls or doors. . . .

(Id., ¶¶ 9-11 (internal paragraph numbering and emphasis omitted).) Finally, Officer Smith specifically avers that he "never used 'unreasonable excessive force'" or "slam[med] Plaintiff on the concrete floor, 'beat Plaintiff about his head and upper-body,' or slam[med] his head against a cell door as [Plaintiff] alleges in his Complaint." (Id., ¶ 15; see also id. (averring that, "at no time did [Officer Smith] ever strike, punch, kick, or tackle Plaintiff nor . . . use any type of weapon against him").)

Moreover, the video evidence confirms that Officer Smith did not participate in taking Plaintiff to the ground or handcuffing him. The video evidence further reflects some level of noncooperation by Plaintiff with the handcuffing (i.e., his apparent resistance to an officer's attempt to move his right arm and the verbal exchange with Sergeant Nelson regarding his failure to surrender his arm) and does not indicate whether Officer Smith observed other officers' application of the suprascapular strikes. The video evidence also supports Officer Smith's assertion that

45

other officers placed Plaintiff against the wall. Finally, the video evidence does not suggest that the officers used significant force in placing Plaintiff against the wall either initially or as he moved back and/or down the wall while Officer Smith attempted to fasten the restraints.

"Section 1983 authorizes a plaintiff to sue for an alleged deprivation of a federal constitutional right by an official acting under color of state law." Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018) (internal quotation marks omitted). "To establish personal liability under § 1983, however, the plaintiff must affirmatively show that the official charged acted personally in the deprivation of the plaintiff's rights. That is, the official's own individual actions must have violated the Constitution." Id. (brackets, citation, and internal quotation marks omitted). "Importantly, mere knowledge of such a deprivation does not suffice." Id.

Because the evidence, even construed in Plaintiff's favor, remains "insufficient to show that [Officer Smith] was personally involved in any" assault of Plaintiff, "no reasonable trier of fact could find that [Officer Smith's] 'own individual actions' violated the Constitution." Id. at 172. "Accordingly, [Officer Smith is] entitled to summary judgment on [Plaintiff's excessive force claim]

46

because [he] lacked sufficient personal involvement in the alleged constitutional deprivation[.]" Id.[15]

## C. Official-Capacity Excessive Force Claim

Finally, Officer Smith urges dismissal of Plaintiff's official-capacity excessive force claim. (See Docket Entry 21 at 16-18.) As relevant here, the Complaint asserts that, "[p]er [Jail Central] customs, ordinances, regulations and[/]or policies, the Detention Tactical Team (D-TAC) was deployed" in response to an altercation between officers and an inmate in Plaintiff's unit.

---

15    Although the Complaint does not proceed under such a theory (see Docket Entry 2 at 1-13; cf., e.g., Docket Entry 8-1 at 4 (attempting, unsuccessfully, to amend Complaint to add claim that Officer Smith "did not try to stop [others] from [acting] maliciously and sadistically")), in certain circumstances an officer can incur Section 1983 liability under a bystander liability theory, see Randall v. Prince George's Cnty., 302 F.3d 188, 202-03 (4th Cir. 2002). "The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." Id. at 203. "Therefore, if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and treated accordingly." Id.    Here, the evidence establishes that Officer Smith did not observe the takedown of Plaintiff. Moreover, although Officer Smith stood near the officers attempting to handcuff Plaintiff while Officer Smith untangled the restraints, the evidence does not establish that he observed the officers applying suprascapular strikes to Plaintiff (or could have prevented them).    Finally, the video evidence establishes that officers acted quickly in placing Plaintiff against the wall (originally and when he moved away from and/or down the wall) and does not suggest that they used significant force in so doing. Accordingly, because the record does not establish that Officer Smith (1) knew "that a fellow officer [wa]s violating [Plaintiff's] constitutional rights," (2) possessed "a reasonable opportunity to prevent the harm[,] and (3) cho[se] not to act," id. at 204, no bystander liability attaches to Officer Smith, see id. at 204-05.

(Docket Entry 2 at 12.) The Complaint further asserts that, "[u]nder the regulations, custom, ordinances, or usage of the [GCSO,] the Defendants were given full discretion and authority to use any amount of force against persons detained in the Guilford County Jail and did so — excessively and without justification — during the incident described herein." (Id. at 4.)

Under Section 1983, official-capacity liability occurs only if "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Collins v. City of Harker Heights, 503 U.S. 115, 121 (1992) (internal quotation marks omitted). Relevant here, "an official's discretionary acts, exercised in carrying out official duties, do not necessarily represent official policy." Perdue v. Harrison, No. 1:17cv403, 2017 WL 4804363, at *2 (M.D.N.C. Oct. 24, 2017). "Rather, the official must have 'final authority' over government policy with respect to the action in question to trigger official capacity liability." Id. (certain internal quotation marks omitted).

At the time of the incident in question, GCSO authorized the use of force "only to the extent the force reasonably appears necessary to affect lawful objectives." (Docket Entry 22, ¶ 15 (emphasis omitted).) Its use of force policy further specified that "[n]othing in this directive authorizes the use of unnecessary force." (Id. (emphasis omitted).) This policy belies Plaintiff's

48

contention that GCSO authorized its employees to utilize any degree of force, including excessive force, against inmates. Moreover, Plaintiff provides no evidence indicating that Officer Smith possessed "final authority" over any such alleged custom or policy. (<u>See</u> Docket Entry 2 at 1-13.) Accordingly, the Court should grant Officer Smith's request for summary judgment on Plaintiff's official-capacity claim.

<u>**CONCLUSION**</u>

Plaintiff failed to exhaust his medical deliberate indifference claim. In addition, Plaintiff's individual-capacity and official-capacity excessive force claims fail as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 20) be granted as follows: Plaintiff's medical deliberate indifference claim should be dismissed without prejudice for failure to exhaust administrative remedies and summary judgment should be entered in favor of Officer Smith on Plaintiff's remaining claims.

This 31st day of January, 2023.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
